**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

PROGRESSIVE NORTHERN INSURANCE )
COMPANY, )
 )
       Plaintiff, )
 )
v. ) Case No. 13-CV-184-GKF-PJC
 )
WILLIAM F. SPENCER, DELVINA )
SPENCER, TAMMY COOPER d/b/a )
Mid-States Trucking, )
 )
       Defendants. )

**OPINION AND ORDER**

Before the court is the Motion for Summary Judgment [Dkt. #20] filed by plaintiff Progressive Northern Insurance Company ("Progressive"). Defendants William F. Spencer and Delvina Spencer ("Spencers") oppose the motion.

In this lawsuit, Progressive, which issued a motor vehicle liability insurance policy to defendant Tammy Cooper d/b/a Mid-States Trucking ("Cooper"), seeks declaratory judgment that it has no duty to defend or respond to a state court lawsuit against Cooper and others for injuries and damages William F. Spencer suffered in a 2011 vehicle accident in Kansas.[1]

**I. Material Facts**

On June 25, 2011, William F. Spencer and non-party Delmer Lee Bruton, Jr. ("Bruton") were involved in a motor vehicle accident ("underlying accident") in or around Iola, Allen

---

[1] Cooper was served by certified mail, return receipt requested, on July 9, 2013. [Dkt. #14]. She has not entered an appearance and is therefore in default.

County, Kansas. [Dkt. #20, Ex. 1, Excerpt of Kansas Motor Vehicle Accident Report]. At the time of the accident, Bruton was driving a 1996 Peterbilt, VIN 1XP5D69X0TD411200. [*Id.*].[2] According to the accident report generated by the Kansas Highway Patrol on June 25, 2011, Cooper was the registered owner of the Peterbilt on that date. [*Id.*].

On August 8, 2011, the Spencers filed suit in Creek County (Bristow) against Bruton, non-party Joey L. Volner d/b/a C&A Trucking ("Volner") and Volner's insurer, non-party Scottsdale Insurance Company ("underlying litigation" or "*Spencer* lawsuit"). [Dkt. #20, Ex. 2, Petition]. On September 28, 2012, the Spencers filed a First Amended Petition in the underlying lawsuit, adding Cooper and Progressive as defendants. [Dkt. #20, Ex. 3, First Amended Petition]. In their First Amended Petition, the Spencers made the following allegations:

## **COUNT ONE**

### **I**

\* \* \*

That at all times material herein, the Defendants were acting by and through the scope of their agents, servants and employees who were within the scope and appointment of their agency and authority.

### **II**

That on or about the 25th day of June, 2011, the Plaintiff, William F. Spencer was operating on a 2007 Volvo semi tractor-trailer traveling southbound on U.S. 169 near Iola, State of Kansas. That at that time, and at that place, the Defendants were operating their 1996 Peterbilt tractor-trailer northbound.

---

[2] In its Complaint, Progressive alleged that during her deposition in the underlying lawsuit, Cooper testified she had sold the Peterbilt to Volner in March 2010 and had not maintained insurance on it since that time. [Dkt. #2, Complaint, ¶¶17-18]. It alleged that, likewise, Volner testified he bought the Peterbilt from Cooper in March 2010 and had maintained insurance on it since that time. [*Id.*, ¶19]. Progressive alleged Volner's wife testified that title to the Peterbilt had not been transferred to Volner until after the June 25, 2011 accident. [*Id.*, ¶21]. Further, it alleged the wife testified that she—without Cooper's knowledge—went to Cooper's residence, obtained a permanent lease agreement that had been executed by Cooper with respect to a completely unrelated lease arrangement, "whited out" certain portions of the existing permanent lease agreement and proceeded to write in Cooper as the leasee and legal owner of the Peterbilt and Volner as the lessor of the vehicle. [*Id.*, ¶22].

2

> The Defendants suddenly and without warning drove their vehicle into the path of the vehicle operated by the Plaintiff herein.
>
> That as a result of the gross negligence of the Defendants, and each of them, William F. Spencer was severely injured which has prevented him from transacting his business, forced him to expend large sums of money to effect a cure to his injuries, caused him a loss of earnings and earning capacity, and caused him to suffer disfiguring, painful, and permanent injuries.
>
> * * *
>
> ### COUNT TWO
>
> **COMES NOW** the Plaintiff, Delvina Spencer, and adopts all allegations heretofore made in Count One of this Petition as if they were fully set forth herein.
>
> ### V
>
> That as a result of the negligent acts of the Defendants, and each of them, this Plaintiff has suffered a loss of services, society, companionship and consortium of her husband, William F. Spencer.
>
> **WHEREFORE,** premises considered, Plaintiffs do pray for judgment against the Defendants, and each of them, for a sum in excess of Ten Thousand Dollars ($10,000.00), as actual damages herein together with a sum in excess of Ten Thousand Dollars ($10,000.00) as punitive damages, together with interest thereon, all costs of this action and for such other relief to which they may be entitled.

[*Id.*, Ex. 3].

Progressive filed a motion for summary judgment in the underlying litigation, asserting that a direct action against an insurer of motor carriers is not permitted pursuant to 47 Okla. Stat. § 162.1. [Dkt. #20, Ex. 4, Order Sustaining Motion for Summary Judgment of Co-Defendant]. On June 6, 2013, the state court granted Progressive's motion and dismissed it from the action. [*Id.*] Progressive did not seek declaratory judgment on the coverage issue in the underlying litigation, instead filing this action in federal court.

3

Progressive issued to its named insured, Cooper, Policy Number 07666624-0, with effective dates of October 8, 2010, to October 8, 2011 ("Progressive Policy"). [Dkt. #20, Ex. 5, Declarations Page issued October 9, 2010].[3] On four occasions before June 25, 2011, the date of the underlying accident, Progressive issued Supplemental Declarations pages to Cooper. [Dkt. #21, Exs. 6-9, Declarations Pages issued October 11, 2010; February 23, 2011; March 26, 2011; and May 18, 2011].

At no point from October 8, 2010 to the date of the underlying accident was the Peterbilt listed as an identified covered vehicle on any Declarations Page of the Progressive Policy. [*Id.*, Exs. 5-9]. At no time prior to the date of the underlying accident were Volner or Bruton listed drivers on the Policy. [*Id.*].

The Progressive contract form is 6912 (03/05), and as of June 25, 2011, the Policy was modified by form numbers 2852OK (11/04), Z434 (09/06), MCS90 (10/99), 4852OK (02/10), 4881OK (11/04), Z228 (07/05) and Z435 (12/06). [*Id.*].

The Progressive Policy states, in pertinent part:

### COMMERCIAL AUTO POLICY

If **you** pay **your** premium when due, **we** will provide the insurance described in this policy.

\* \* \*

### GENERAL DEFINITIONS

**The words and phrases below, whether in the singular, plural or possessive, have the following special meanings when appearing in boldface type in this policy, and in endorsements issued in connection with this policy, unless specially modified.**

\* \* \*

---

[3] The Spencers assert—and Progressive admits—that certain endorsements, including endorsements Z435 and MCS90, were omitted from the copy of the policy attached as Ex. 10 to Progressive's Motion for Summary Judgment. Progressive included the missing endorsements as Exs. 1-7 in its reply.

5. **"Insured auto"** or **"your insured auto"** means:
   a. Any **auto** specifically described on the **Declarations Page,** unless **you** have asked **us** to delete that **auto** from the policy.
   b. Any additional **auto** on the date **you** become the owner if:
      (i) **you** acquire the **auto** during the policy period shown on the **Declarations Page**;
      (ii) **we** insure all **autos** owned by **you** that are used in **your** business; and
      (iii) no other insurance policy provides coverage for that **auto.**

   **We** will provide coverage for an additional **auto** for a period of thirty (30) days after **you** become the owner of such additional **auto**. **We** will not provide any coverage after this thirty (30) day period unless within this period **you** ask **us** to insure the additional **auto**. If **you** add any coverage, increase **your** limits or make any other changes to this policy during this thirty (30) day period, these changes to **your** policy will not become effective until after **you** ask **us** to add the coverage, increase **your** limits or make such changes. **We** may charge premium for the additional **auto** from the date **you** acquire the **auto.**

   With respect to PART I – LIABILITY TO OTHERS, if **we** provide coverage for an additionally acquired **auto** in accordance with this paragraph b., **we** will provide the same coverage for such additional **auto** as **we** provide for any **auto** shown on the **Declarations Page.**

   * * *

   c. Any replacement **auto** on the date **you** become the owner if:
      (i) **you** acquire the **auto** during the policy period shown on the **Declarations Page;**
      (ii) the **auto** that **you** acquire replaces one specifically described on the **Declarations Page** due to termination of **your** ownership of the replaced **auto** or due to mechanical breakdown of, deterioration of, or **loss** to the replaced **auto** that renders it permanently inoperable; and
      (iii) no other insurance policy provides coverage for that **auto**.
   If **we** provide coverage for a replacement **auto, we** will provide the same coverage for the replacement **auto** as we provide for the replaced **auto. We** will provide that coverage for a period of thirty (30) days after **you** become the owner of such replacement **auto**. **We** will not provide any coverage after this thirty (30) day period unless within this period **you** ask **us** to insure the replacement **auto**. If **you** add any coverage, increase **your** limits or make any other changes to **your** policy during this thirty (30) day period, these changes to **your** policy will not become effective until after

>    **you** ask **us** to add the coverage, increase **your** limits or make such changes.
>
>    If ownership of any **insured auto** is transferred, or such **auto** becomes permanently inoperable, this policy no longer applies to it.
>
>    \* \* \*

14. "**Temporary substitute auto"** means any **auto** used, with the permission of its owner, as a substitute for an **insured auto** that has been withdrawn from normal use due to breakdown, repair, servicing, loss or destruction, and that is:

    a. not owned by or registered to **you**, or if **you** are a natural person, not owned by or registered to **you, your** nonresident spouse, or a resident of the household in which **you** reside;
    b. not leased by **you** under a written contract for a period of six (6) months or more, or if **you** are a natural person, not leased by **you, your** nonresident spouse, or a resident of the household in which **you** reside, under a written contract for a period of six (6) months or more;
    c. not owned by **your** employee or leased by **your** employee under a written contract for a period of six (6) months or more; and
    d. not borrowed from **your** employees or members of their households.

                                   \* \* \*

17. **"You", "your"** and **"yours"** refer to the named insured shown on the **Declarations Page.**

                                   \* \* \*

### INSURING AGREEMENT – LIABILITY TO OTHERS

> Subject to the Limits of Liability, if **you** pay the premium for liability coverage, **we** will pay damages, OTHER THAN PUNITIVE OR EXEMPLARY DAMAGES, for **bodily injury, property damage,** and **covered pollution cost or expense,** for which an **insured** becomes legally responsible because of an **accident** arising out of the ownership, maintenance or use of an **insured auto.** However, **we** will only pay for the **covered pollution cost or expense** if the same **accident** also caused **bodily injury** or **property damage** to which this insurance applies.
>
> **We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this Part I. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

**ADDITIONAL DEFINITIONS USED IN THIS PART ONLY**

   A. When used in PART I – LIABILITY TO OTHERS, **insured** means:
      1. **You** with respect to an **insured auto.**
      2. Any person while using, with **your** permission, and within the scope of that permission, an **insured auto you** own, hire, or borrow …

* * *

For purposes of this subsection A.2., an **insured auto you** own includes any **auto** specifically described on the **Declarations Page.**

      3. Any other person or organization, but only with respect to the legal liability of that person or organization for acts or omissions of any person otherwise covered under this PART I - LIABILITY TO OTHERS.

* * *

   B. When used in PART I – LIABILITY TO OTHERS, **insured auto** also includes:

      1. **Trailers**, with a load capacity of 2,000 pounds or less and designed primarily for travel on public roads, while connected to **your insured auto** that is a power unit;
      2. **Mobile equipment** while being carried or towed by an **insured auto**; and
      3. Any **temporary substitute auto.**

[Dkt. #20, Ex. 10, Oklahoma Commercial Auto Policy, at pp. SPENCER 0063-0068].

Endorsement MCS90, dated October 8, 2010, states, in pertinent part:

the insurer . . . agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.

[Dkt. #22, Ex. 2, Endorsement MCS90].

Title for the Peterbilt was issued to Cooper on April 23, 2009. [Dkt. #20, Ex. 11, Title].

Cooper registered the Peterbilt in her name on January 1, 2010. [Dkt. #20, Ex. 12, Registration].

In October of 2012, after receiving notice from Cooper of the *Spencer* lawsuit and the First Amended Petition, Progressive retained counsel to represent Cooper pursuant to a reservation of all of its rights and defenses under the Policy. [Dkt. #2, Complaint, ¶30]. Progressive continued to provide a defense for Cooper in the underlying litigation, but tendered the defense and indemnity of Cooper to another insurer, Scottsdale Insurance Company ("Scottsdale"). [Dkt. #22 at 9, n.1]. During the April 15, 2014 hearing on the pending motion, counsel for Progressive advised that Scottsdale had recently accepted its tender of defense.

## II. Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted).

"An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. . . . An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler*, 144 F.3d at 670 (citations omitted).  In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Id.* at 252.

### III. Analysis

Progressive seeks summary judgment on its declaratory judgment claim, asserting:  (1) the Peterbilt is not an "insured auto" under the Progressive Policy; and (2) the Peterbilt is not an "insured auto" under the Progressive Policy as set forth in Paragraph B of the Additional Definitions Section of Part I - Liability to Others.

The Spencers contend summary judgment is inappropriate because (1) no justiciable controversy exists and (2) even if a justiciable controversy exists, Progressive has liability exposure based on the Form MCS-90 it issued in connection with the policy.

### A. Justiciability

The Declaratory Judgment Act permits the court, "[i]n a case of actual controversy . . . to declare the rights and other relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).  The Supreme Court has stated:

> The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy.  Basically, the question in each case is

> whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). "It is well established that what makes a declaratory judgment action a proper resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109-1110 (10th Cir. 2010) (citation omitted). "The crucial question is whether granting a present determination of the issues offered will have some effect in the real world." *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005) (citation omitted).

At the time Progressive filed this action, it had incurred and was continuing to incur costs to provide a defense to Cooper in the underlying litigation. Although Scottsdale has recently accepted the tender of defense, Progressive has nonetheless racked up "real world" expenses. Moreover, Progressive seeks a declaration of coverage because it intends to seek indemnification of those expenses from Scottsdale. Therefore, a justiciable "controversy" exists.

## B. Coverage Under the Policy

The Spencers concede the Peterbilt was not an "insured auto" under the terms of the policy itself but contend that under Form MCS-90, Progressive is "on the risk" if Cooper is liable as a motor carrier, "regardless of whether or not each motor vehicle is specifically described in the policy."[4]

---

[4] The Spencers also contend Progressive's declaratory judgment claim was a compulsory counterclaim in the underlying litigation. The court, however, previously rejected this argument in its Opinion and Order of August 22, 2013 [Dkt. #15] denying the Spencers' Motion to Dismiss.

Although the Spencers cite no legal authority for their position, it appears to be based on the Tenth Circuit's holding in *Empire Fire and Marine Ins. Co. v. Guaranty Nat'l Ins.*, 868 F.2d 357 (10th Cir. 1989). That holding, however, was expressly overruled by the Tenth Circuit in *Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868 (10th Cir. 2009).

The *Carolina Casualty* decision contains an extensive discussion of jurisprudence on the scope and application of federally mandated insurance for interstate commercial motor carriers. As the court explained, federal regulations require interstate trucking companies to maintain insurance or another form of surety "conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles." *Id.* at 870 (quoting 49 C.F.R. § 387.301(a)). Most interstate trucking companies obtain the MCS-90 endorsement to one or more of their insurance policies. An MCS-90 endorsement "is intended to eliminate the possibility of a denial of coverage by requiring the insurer to pay any final judgment recovered against the insured for negligence in the operation, maintenance, or use of motor vehicles subject to federal financial responsibility requirements, even though the accident vehicle is not listed in the policy." *Id.* (citation omitted).

The court in *Carolina Casualty* explained:

> In *Empire Fire*, we evaluated the effect of an MCS-90 endorsement where multiple insurance policies covered an accident between a trucker and a member of the public. In resolving which of the policies provided primary coverage, we concluded the MCS-90 endorsement amended contrary language in the underlying insurance policy, which would otherwise have limited the insurance carrier's liability to excess coverage. Because multiple potential sources of liability coverage existed, we held that liability for primary coverage should be allocated among the insurers pursuant to traditional state insurance and contract law principles. This holding has been interpreted to mean that an MCS-90 endorsement modifies the underlying insurance policy in a variety of ways, including (1) allowing recovery from a policy that otherwise does not provide

> liability coverage, and (2) allowing primary liability recovery from a policy that provides only excess coverage.

*Id.* at 870-71 (citations omitted). The court acknowledged that the ruling in *Empire Fire* "has placed this circuit in a minority for quite some time," and only the Sixth Circuit had followed its lead. *Id.* at 871. Therefore, the court, sitting *en banc*, revisited its prior reasoning and "join[ed] the majority of circuits in recognizing the MCS-90 endorsement as a surety obligation." *Id.* The court stated:

> [W]e hold the MCS-90 endorsement only applies where: (1) the underlying insurance policy to which the endorsement is attached does not provide coverage for the motor carrier's accident, *and* (2) the motor carrier's insurance coverage is either not sufficient to satisfy the federally-prescribed minimum levels of financial responsibility or is non-existent.

*Id.*

In so ruling, the court recapped the history of the MCS-90 endorsement. The Motor Carrier Act of 1980 ("MCA") provides that a commercial motor carrier may operate only if registered to do so and must be "willing and able to comply with . . . [certain] minimum financial responsibility requirements." *Id.* at 874. Specifically, a motor carrier transporting property must demonstrate financial responsibility of at least $750,000.00. *Id.* at 874 n.4. Implementing regulations require proof of financial responsibility by one of three methods: (1) a Form MCS-90 endorsement; (2) a Form MCS-82 surety bond; or (3) authorization from the Federal Motor Carrier Safety Administration to self-insure. *Id.* at 874.

The Tenth Circuit listed several "key conclusions" about the financial responsibility requirements:

- [T]he financial responsibility provisions require motor carriers to demonstrate they are adequately insured in order to protect the public from risks created by the carriers' operations. From the express language of the [MCA] and the regulations, these provisions are intended to impose a mandatory requirement that motor

> carriers obtain a minimum level of liability insurance, depending on the cargo they carry.
>
> - [T]he provisions were designed to ensure *collectability* of a judgment—not to relieve the injured member of the public from the requirement that he or she obtain a final judgment of legal liability against the motor carrier and its insurers as a prerequisite.
>
> - [A]n MCS-90 endorsement . . . is ambiguous with respect to how it interacts with the underlying insurance policy. The endorsement states that "no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the [insurance company] from liability or from the payment of any final judgment, within the limits of liability herein described." On one hand, this provision may suggest the endorsement modifies the underlying policy to the extent the policy is inconsistent. But on the other hand, the endorsement further provides that "all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company." It is precisely this ambiguity that has created the confusion about the effect of an MCS-90 endorsement on an injured party's right to recover a negligence judgment against a motor carrier.

*Id.* at 875 (citations omitted).

The court explained that courts dealing with MCS-90 endorsements are typically confronted with two determinations that must be resolved contemporaneously: "(1) the proper allocation of insurance liability among multiple insurers and the motor carrier; and (2) any possible public financial responsibility because of a shortfall in available sources for satisfaction of a judgment against the motor carrier, at least up to the prescribed minimum amount under the regulations." *Id.*

The court described the framework adopted by the majority approach as follows:

First, the cases describe the insurer's obligation under the MCS-90 endorsement as one of a surety rather than a modification of the underlying policy. The endorsement is a safety net in the event other insurance is lacking. . . . Under this reasoning, an MCS-90 insurer's duty to pay a judgment arises not from any insurance obligation, but from the endorsement's language *guaranteeing* a source of recovery in the event the motor carrier negligently injures a member of the public on the highways.

> Second, in marked contrast to our approach in *Empire Fire*, these cases describe the surety obligation—to pay a negligence judgment against a motor carrier under the MCS-90 endorsement—as one that is triggered only when (1) the underlying insurance policy to which the endorsement is attached does not otherwise provide coverage, *and* (2) either no other insurer is available to satisfy the judgment against the motor carrier, or the motor carrier's insurance coverage is insufficient to satisfy the federally-prescribed minimum levels of financial responsibility.
>
> Third, . . . the MCS-90 endorsement, its terms and its operating provisions that supercede any limitation in the underlying insurance policy are only implicated as between an injured member of the public and the MCS-90 insurer. Referencing the express language of the MCS-90 endorsement . . . –these cases conclude the MCS-90 endorsement operates only to protect the public and does not alter the relationship between the insured and the insurer as otherwise provided in the policy. . . . The endorsement, in other words, is irrelevant to and has no effect on the ultimate allocation of a judgment against a motor carrier as between the carrier and its various insurers.
>
> Finally, . . . the MCS-90 endorsement operates only to guarantee a source of payment of a judgment, and does not relieve the motor carrier or its liability insurers . . . of their duty to satisfy an injured party's judgment against the carrier. The peculiar nature of the MCS-90 endorsement grants the judgment creditor the right to demand payment directly from the insurer, and simultaneously grants the insurer the right to demand reimbursement from the insured. A motor carrier may be required to reimburse the MCS-90 insurer for any payout the insurer would not otherwise have been obligated to make. . . .

*Id.* at 878-79 (citations omitted).

The Tenth Circuit abandoned the *Empire Fire* framework, adopted the majority view and concluded the MCS-90 endorsement is intended to impose a surety obligation on the insurance company. *Id.* at 879.

The court described two scenarios which would trigger the surety obligation imposed by the MCS-90 endorsement:

> After a negligence judgment is rendered against a motor carrier, the MCS-90 insurer's obligation is only triggered when (1) its underlying insurance policy does not provide liability coverage, and (2) either no other insurer provides coverage for the accident or the motor carrier's insurance coverage, in aggregate, is insufficient to satisfy the regulatory requirements. Finally, we conclude the MCS-90 endorsement does not apply once the federally-mandated minimums have been satisfied.

*Id.* at 885-86.

In this case, Progressive seeks a declaratory judgment that it has no duty to defend or respond to a state court lawsuit against Cooper and others for injuries and damages William F. Spencer suffered in the 2011 vehicle accident in Kansas, because the tractor trailer involved in the accident was not a covered vehicle under the policy. It is uncontroverted that the tractor trailer was not a covered vehicle under the policy.

Progressive does not seek any determination regarding its obligation under the MCS-90 endorsement and, indeed, that issue is not a "justiciable controversy" as defined above. Applying the Tenth Circuit's holding in *Carolina Casualty*, that issue is not ripe because no judgment has been entered in the underlying case, nor has there been a determination that no other insurer provides coverage for the accident or the insurance coverage is insufficient to satisfy the regulatory requirements.

### IV. Conclusion

For the reasons set forth above, Progressive's Motion for Summary Judgment [Dkt. #20] is granted.

ENTERED this 18th day of April, 2014.

_____
GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT